IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| **AMANDA MICHEL, as parent and natural guardian of D.M., a minor, and AMANDA MICHEL, individually,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Civ. No.: 3:20-cv-00246-TAV-HBG** |
| **UNION COUNTY BOARD OF EDUCATION; UNION COUNTY PUBLIC SCHOOLS; UNION COUNTY, TENNESSEE; JAMES E. CARTER, individually and officially as Director of Union County Board of Education; LARRY KERR, individually and officially as a teacher and head football coach of Union County High School; DEREK MARLOW, individually and officially as a teacher and football coach of Union County High School; and SHANE BROWN, individually and officially as a teacher and athletic director of Union County High School,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS UNION COUNTY BOARD OF EDUCATION, JAMES E. CARTER, LARRY KERR, DEREK MARLOW, AND SHANE BROWN'S MOTION TO DISMISS COMPLAINT**

Plaintiff Amanda Michel, as parent and natural guardian of D.M., a minor, by and through

counsel, hereby submit their response to Defendants, Union County Board of Education, James

E. Carter, Larry Kerr, Derek Marlow and Shane Brown's Motion to Dismiss.

**INTRODUCTION**

Defendants base their Fed. R. Civ. P. 12(b)(6) Motion on the following premises:

a.       That Counts I, II, III, and IV and Count V against the Individual Defendants should be dismissed for failure to state a claim.

b.       That Count II should be dismissed pursuant to Tennessee's statute of limitations.

c.       That Counts I and II should be dismissed for qualified and municipal immunity.

d.       That Counts III and IV and Count V against the Individual Defendants should be dismissed on the basis of governmental immunity.

## FACTS

On May 9, 2019, the Union County High School football team was engaged in a full-contact practice session. (Comp. ¶ 22) [Doc. 1]. During this practice, the team was pitting the offensive squad against the defensive squad. Id. D.M., a sixteen (16) year-old minor, was playing on the defensive squad. (Comp. ¶ 1, 22). While participating in this practice, D.M. was on the receiving end of a severe helmet-to-helmet impact with another Union County High School football player. (Comp. ¶ 23). Following this collision, D.M. asked Coach Marlow if he could sit out because he was suffering from a severe headache. Id. Coach Marlow, an assistant with the Union County High School football team, allowed D.M. to temporarily sit out, take his helmet off, and drink some water. (Comp. ¶ 24). After a few minutes, Coach Marlow ordered D.M. to "get back out there." Id.

D.M. did as he was instructed and returned to the full-contact practice. (Comp. ¶ 27). D.M. stayed in the practice for a few more plays despite his worsening and severe headache and he, ultimately, collapsed on the field. Id. D.M.'s head injury was so severe that he was immediately transported to the University of Tennessee Medical Center in Knoxville, Tennessee where he underwent emergency brain surgery. (Comp. ¶ 28). His condition was so grave that he was placed in the intensive care unit for approximately one week. Id. Following D.M.'s stay

in the intensive care unit, he was returned home to his mother, Amanda Michel. (Comp. ¶ 2, 28). While home, D.M. struggled through his recovery but began exhibiting delusional type symptoms and was again hospitalized in June 2019. (Comp. ¶ 29). D.M. remained in the hospital for another week and continues to be under the care of medical professionals for his traumatic brain injury and associated seizure activity. (Comp. ¶ 29, 30). According to D.M.'s treating physicians, he sustained a permanent brain injury, will have to take seizure medication for the remainder of his life, and will never play contact sports again. (Comp. ¶ 31).

Effective January 1, 2014, the Tennessee General Assembly passed legislation intended to "protect student athletes who suffer concussions from risking further medical complications or death." *Tennessee News Release, S. Rep. 2/20/2013*. According to Senator Jim Tracy, "This is a much needed bill . . . Education and instruction regarding concussions can help avoid a preventable tragedy." *Id.* According to well-publicized reports from the Center for Disease Control (CDC), studies spanning 2001 – 2009 showed "concussions among youth increased 60%, leading the [CDC] to label concussion frequency as reaching 'epidemic' proportions." *Id.* The legislation responding to this epidemic was codified at Tenn. Code Ann. § 68-55-502 and requires Tennessee schools to adopt and implement mandatory standards and guidelines to achieve the Bill's intended purpose, protecting student athletes from concussion related injury. (Comp. ¶ 15, 16, 17, 18).

Specifically, the Bill requires, among other things, that coaches and school administrators receive annual training regarding the recognition of the signs and symptoms of concussions and seeking proper medical treatment for suspected concussions. (Comp. ¶ 15). Moreover, it requires that the governing authority of each high school ensure that no student athlete suspected of sustaining a concussion injury be allowed to return to play or practice until such time as that

student athlete has received written clearance from a properly trained medical provider. (Comp. ¶ 17). Despite these legislative mandates, neither Union County Board of Education (hereinafter "UCBE"), Union County High School (hereinafter "UCHS"), Director of UCBE, James E. Carter, UCHS athletic director, Shane Brown, UCHS head football coach, Larry Kerr, nor UCHS assistant football coach, Derek Marlow have complied with their mandatory responsibilities to implement rules, policies or procedures ensuring compliance with Tenn. Code Ann. § 68-55-502. (Comp. ¶ 20).

UCHS is also a member of the Tennessee Secondary School Athletic Association (hereinafter "TSSAA") which enacted a concussion policy that all member schools must follow. (Comp. ¶ 18). This policy, revised on July 5, 2014, unequivocally states, "[a]ny player who exhibits signs, symptoms or behaviors consistent with a concussion (such as loss of consciousness, *headache*, dizziness, confusion or balance problems) shall be immediately removed from the game and shall not return to play until cleared by an appropriate health-care professional." *Id.* (emphasis added). To assist training and educating coaches, athletic directors, school administrators, student athletes and their parents on this policy, the TSSAA developed a free twenty (20) minute online course and instructed athletic directors that "failure to [require every coach in their school to complete the course] is not an option." *Tennessee Secondary School Athletic Association Concussion Policy, Revised 7/5/2014*. Again, Defendants failed to take these mandatory actions. (Comp. ¶ 19, 20).

Following D.M.'s helmet-to-helmet strike and request to be removed from play for symptoms of a concussion, he was returned to play, he was not examined by a medical provider trained in concussion recognition, his mother was not notified of the incident, and he suffered life altering consequences as a result. (Comp. ¶ 23, 24, 27, 31).

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible when it includes "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard is not the same as a probability standard, but "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* Thus, if a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007).

When ruling on a motion to dismiss, the Court must accept the factual allegations of the complaint as true and construe them in a light most favorable to the non-moving party. *Twombly,* 550 U.S. at 544-55. However, the Court is not bound to accept as true a legal conclusion couched as a factual allegation. *Id.* At 555-56. "In evaluating a motion to dismiss [a court] may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein." *Luis v. Zang*, 833 F.3d 619, 626 (6th Cir. 2016).

## ARGUMENT

### A. PLAINTIFF HAS ADEQUATELY PLEAD CLAIMS UNDER 42 U.S.C. § 1983.

Defendants argue that Plaintiff has failed to plead sufficient facts to support her claims for state created danger and interference with parent-child relationship. Def. Mot. at p. 4, 13.

[Doc. 25]. To the contrary, Plaintiffs' Complaint was timely filed and contains factual allegations which are more than sufficient to state a claim under 42 U.S.C. § 1983 and survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss.

### 1. Plaintiff's State Created Danger Claim is Sufficiently Plead.

In order to state a claim for state created danger, a plaintiff must prove "(1) an affirmative act by [the defendant] which either created or increased the risk that [the plaintiff] would be exposed to an act of violence by a third party; (2) a special danger to [plaintiff] wherein [defendant]'s actions placed [plaintiff] specifically at risk, as distinguished from a risk that affects the public at large; and (3) [defendant] knew or should have known that [his] actions specifically endangered [plaintiff]." *Millinder v. Hudgins, Jr.*, 421 F.Supp.3d 549, 558 (W.D. Tenn. 2019) (quoting *Nelson v. City of Madison Heights*, 845 F.3d 695, 700 (6th Cir. 2017)). Plaintiff's Complaint satisfies each of these elements.

### a. Defendants' Affirmative Actions Created and Increased the Risk that D.M. Would Suffer Harm.

Due to the difficulty in determining action from inaction, the Sixth Circuit has stated that "[r]ather than focusing on the often metaphysical question of whether [a defendant's] behavior amounts to affirmative conduct or not, we have focused on 'whether [the victim] was safer before the state action than he was after it.'" *Koulta v. Merciez*, 477 F.3d 442, 445-46 (6th Cir. 2009) (quoting *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)). That is certainly true here.

In this case, D.M. was participating in a school sanctioned and administered football practice where he sustained a concussion. (Comp. ¶ 22, 23). Thereafter, D.M. requested to sit out because he was suffering a severe headache. Id. Disregarding both Tennessee law and TSSAA rules designed to protect student athletes in D.M.'s position, the coaching staff of UCHS

failed to provide D.M. with a proper medical evaluation and instructed him to "get back in there" to the full-contact practice. (Comp. ¶ 15-18, 24). "If the state puts a man in a position of danger from private persons and fails to protect him . . . it is as much an active tortfeasor as if it had thrown him into a snake pit." *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982). Here, UCBE, UCHS and its athletics staff created the danger to D.M., failed to protect him when there was reason to know he was especially vulnerable to harm, and threw him back into the proverbial "snake pit."

In *Davis v. Brady*, the Sixth Circuit found that police officers, who stopped a drunk driver, took away his keys, and left him on the side of the road where he was subsequently severely injured, had created a situation where the government's actions placed the plaintiff in harm's way and were liable for his injuries. 143 F.3d 1021, 1027 (6th Cir. 1998). Similar to the facts presented in this case, the police officers created a hazardous and dangerous situation and put the plaintiff in greater danger than they found him. Here, the Defendants were responsible for conducting the football practice and, ostensibly, in charge of the activities. The Defendants then, through both the affirmative disregard of their statutory duties and Coach Marlow's command to D.M. to "get back in there," created, managed, and increased a known likelihood of harm to D.M.

Moreover, this case is distinguishable from *McQueen v. Beecher Community Schools*. 433 F.3d 460 (6th Cir. 2006). In *McQueen*, a student was left unattended with another student with known behavior problems and a history of bullying. *McQueen*, 433 F.3d at 462. Tragically, the plaintiff's child was shot and killed by the other student while left unattended in the classroom. *Id*. at 462-63. No evidence was presented that the teacher had any inkling that the student had a gun prior to leaving the room. *Id*. at 467. On review, the Sixth Circuit found that

the teacher's action of leaving the classroom unattended did not create or increase the risk of private violence. Here, the Defendants were responsible for conducting the football practice, were given notice that D.M. had suffered a head trauma, failed to take mandatory measures to determine the severity of his injury, and gave him direct instructions to return to the full-contact football practice. Unlike a typical classroom, an active football field is an inherently dangerous place where physical contact is not just likely, but expected. Further, Coach Marlow, unlike the teacher in *McQueen*, completely understood the intrinsically violent nature of a full-contact football practice and, by placing D.M. back in the practice after he exhibited classic symptoms of a concussion. Coach Marlow engaged in direct action which placed D.M. in increased risk of harm by placing him, in a more vulnerable state, back into a violent environment which was wholly created and supervised by UCHS.

**b. Defendants' Affirmative Actions Placed D.M. in Special Danger.**

Plaintiff's Complaint has sufficiently stated facts, when taken as true, establishes that D.M. was placed in a position of special danger that was not posed to the public at large. In *McQueen*, the Sixth Circuit found that a student placed unattended in a classroom with another student possessing a gun was found to be in a position of special danger which was not threatening the general public. *McQueen*, 433 F.3d at 468. Like the plaintiff in *McQueen*, D.M. was in a school environment and placed in a dangerous situation that was confined to a specific state-created location. As the Sixth Circuit posited, even though in *McQueen* there was a possibility that the gun-wielding child could have exited the classroom or even the school and presented a more widespread danger, "those risks were smaller than and collateral to the risks faced by the five children present in the classroom with him." *Id.* Certainly, the likelihood of rogue UCHS football players leaving the confines of the practice field and colliding head-to-

head with members of the general public is incomprehensibly remote. Even more remote is the possibility that a random person would enter the practice field, suffer a concussion, and be ordered to return to the field to continue play.

The Defendants argue that "[t]here are no allegations that D.M. was singled out or placed in a unique position of 'special danger.'" Def. Brief at p. 9. That is simply not the case nor the test the Sixth Circuit has applied to establish this element. For example, Plaintiff plead that D.M. was a member of the UCHS football squad. (Comp. ¶ 1). She alleged that D.M. suffered from a head-to-head collision while on the practice field. (Comp. ¶ 23). Her Complaint further stated that D.M. was not provided mandatory concussion screening by a medical professional and that he was directed to return to the field notwithstanding the seriousness of his injury. (Comp. ¶ 24, 25). Even if Defendants' argument that "D.M. was in no different situation than any other player on the team participating in the practice" were true, the Sixth Circuit's holding in *McQueen* would still find that D.M. was in a position of special state created danger.

### c. Defendants' Actions Demonstrate the Requisite Culpability for Liability.

Plaintiff's Complaint has alleged facts sufficient to show, when taken as true, that the Defendants acted with the requisite culpability to be held liable for their affirmative acts which increased the risk of harm to D.M. The Sixth Circuit has held that a state actor demonstrates the requisite culpability in a state created danger claim where they acted with deliberate indifference. *See McQueen*, 433 F.3d at 469; *Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir. 2003); *Ewolski v. City of Brunswick*, 287 F.3d 492, 511 n. 5 (6th Cir. 2002). "The guiding principle seems to be that a deliberate-indifference standard is appropriate in settings [that] provide the opportunity for reflection and unhurried judgment, but that a higher bar may be necessary when opportunities for reasoned deliberation are not present." *McQueen*, 433 F.3d at 469.

The Sixth Circuit has equated the deliberate indifference standard with subjective recklessness. *See Id.*; *Ewolski*, 287 F.3d at 513. To meet this standard, a plaintiff must show the official was both "aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483, 493 (6th Cir. 2002). This standard can also "be proven circumstantially by evidence showing that the risk was so obvious that the official had to have known about it." *Bukowski*, 326 F.3d at 710. Plaintiff's allegations have met this burden.

First, Plaintiff's Complaint alleges a factual situation where Coach Marlow and the other UCHS coaching staff had an opportunity for reflection and unhurried judgment. Specifically, following the play where D.M. suffered his helmet-to-helmet collision, he requested to be removed from the practice because he was suffering from a severe headache. (Comp. ¶ 23). In response, the UCHS coaching staff allowed him to leave the field, remove his helmet and drink some water before instructing him to "get back out there." (Comp. ¶ 24). Nothing presented in these facts would indicate anything other than a situation where the UCHS coaches were forced to make snap decisions. Instead, these facts clearly demonstrate that Defendants had ample time to deliberate and made their fateful decision to return D.M. to the practice after suitable time to assess the situation. This situation is analogous to the circumstances presented in *McQueen* where the Sixth Circuit determined that the teacher "had the opportunity to reflect and deliberate before deciding to leave . . . several children unsupervised in the classroom." *McQueen*, 433 F.3d at 470.

Next, Plaintiff adequately plead facts which would show the Defendants were aware of facts that would draw the inference that a substantial risk of harm existed to D.M. Following the helmet-to-helmet collision, D.M. complained of a severe headache and asked to be removed from

the practice field. The UCHS football team's coaching staff could not be ignorant of the nature of playing football and obviously understood that players were colliding on the field since the full-contact practice was under their supervision. Therefore, there can be little doubt that Defendants understood that D.M. was being subjected to a heightened risk of harm by being ordered to re-enter the practice.

Additionally, Plaintiff's Complaint has alleged facts sufficient to show that "the risk was so obvious that the official had to have known about it." *Bukowski*, 326 F.3d at 710. Besides the above stated allegations showing D.M. complained of a severe headache following a helmet-to-helmet collision, Plaintiff has plead the widespread dissemination of studies presenting the dangers to student athletes suffering from concussions. For example, the TSSAA concussion protocol, the implementation of Tenn. Code Ann. § 68-55-502, the CDC studies showing the increase of student athlete concussions had reached epidemic proportions all demonstrate that the dangers presented to D.M. by putting him back into a full-contact practice were open and obvious to any rational person in the UCHS coaching staffs' position. (Comp. ¶ 15-19).

In *McQueen*, the Sixth Circuit found the facts did not support a finding of deliberate indifference because the plaintiff made no allegations whatsoever that the defendant in that case had any knowledge that a child in the classroom had possession of a deadly weapon. *McQueen*, 433 F.3d 470. Further, there was no indication that the offending child would step up his bullying from fist, feet and pencils to guns. *Id.* As the court said, "[a]bsent such evidence, [plaintiff] cannot show that the [risk of such a violent attack . . .] was so obvious that [the teacher] had to have known about it." *Id.* Unlike the plaintiff in *McQueen*, Plaintiff has plead facts showing that D.M. was likely in harm of suffering further harm if put on the practice field. Specifically, he had already been injured once during the practice and the widespread information available

and common knowledge instruct a rational person in the UCHS coaching staffs' position that by putting D.M. back into the practice without following mandatory medical protocol they would be subjecting him to an unreasonably elevated risk of harm.

As Defendants note, there are no cases directly analogous with the factual scenario presented in this case. However, the Third Circuit has directly addressed these issues and found that an "injured student-athlete participating in a contact sport has a constitutional right to be protected from further harm, and a state actor violates that right when the injured student-athlete is required to be exposed to a risk of harm by continuing to practice or compete." *Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165 (3rd Cir. 2017). In *Mann*, a high school football player was participating in a full-contact practice session when he sustained a blow to the head. *Mann*, 872 F.3d at 168. The hit was so hard that other members of the team believed that the student athlete had suffered a concussion. *Id.* Nonetheless, the coaching staff, ostensibly aware of the severity of the hit, sent him back into the full-contact practice where he was exposed to further physical contact. *Id.* Following the practice, the student athlete was diagnosed with a traumatic brain injury. *Id.* The Third Circuit determined that these facts were sufficient to show that the coaching staff was "deliberately indifferent to the risks posed" to the student athlete by putting him in danger of further violent physical contact. *Id.* at 172.

Defendants urge that "[e]xtending the Due Process Clause to Plaintiff's situation here would create a substantive due process claim for any student participating in any school extracurricular activity, supplanting state tort law with federal constitutional law far beyond the intent of the Constitution." Def. Brief at p. 13. This hyperbolic argument overstates the scope of the issues presented in this case and ignores that Plaintiff is not seeking an extension of federal law, merely existing law's proper application to the facts of this case. Specifically, that a Section

1983 claim exists when, as here, a state actor places an injured student athlete in further risk of bodily harm by requiring him or her to continue practicing or competing.

## 2. Plaintiff's Interference with her Parental Rights Claim is Timely Filed and Sufficiently Plead.

### a. Plaintiff's Claim of Interference with her Parental Rights was Timely Filed.

In § 1983 actions, "state law determines which statute of limitations applies," and "while federal law determines when the statutory period begins to run." *Harrison v. Michigan*, 772 F.3d 768, 772-73 (6th Cir. 2013). In other words, the law of the state where an action occurred determines how long a party has before it must bring a claim for that action, and federal law determines the date that begins that calculation. Plaintiff agrees with Defendants that the entirety of this case occurred in the State of Tennessee. Def. Brief at p. 13. Further, Plaintiff agrees with Defendants that Tennessee's one-year statute of limitations on personal injury claims applies to this § 1983 action for interference with her parent-child relationship. Id. Plaintiff, however, disagrees with Defendants' assertion that the extension of the statutory period announced in the Supreme Court of Tennessee's Order Modifying Suspension of In-Person Court Proceedings and Further Extension of Deadlines is not applicable. ASM2020-00428, April 24, 2020, ¶ 7, and ADM2020-00428, ¶ 7.

In response to the ongoing pandemic, the Tennessee Supreme Court, pursuant to state authority granted it in Article IV, § 1 of the Tennessee Constitution; Tenn. Code Ann. §§ 16-3-501 to 16-3-504; *Moore-Pennoyer v. State*, 515 S.W.3d 271, 276-77 (Tenn. 2017); Tenn. Sup. Ct. R. 49; and Tenn. Code Ann. § 28-1-16, prescribed that "[s]tatutes of limitations and statutes of repose that would otherwise expire during the period from Friday, March 13, 2020, through Sunday May 31, 2020, are hereby extended through Friday, June 5, 2020." Id. The Tennessee

Supreme Court has been granted this authority by the state's General Assembly in Tenn. Code Ann. § 28-1-116 which states:

> In the event that a duly authorized member of the appellate judiciary enters an order declaring a disaster pursuant to the Tennessee supreme court rules, or the Tennessee rules of civil or appellate procedure, all applicable statutes of limitations and statutes of repose shall be extended in the counties subject to the order by the same number of days by which other applicable filing deadlines are extended. In the event an action could be properly filed in more than one (1) county, the deadline for that action shall be extended only in the county or counties in which a disaster is declared by order.

Therefore, since the duration of a statute of limitations is determined by state law, the Order of the Tennessee Supreme Court pursuant to duly passed laws of the Tennessee General Assembly is controlling on Plaintiff's filing of her interference with parental relations claim under § 1983. Given the above, the fact that Plaintiff's claim was not filed until June 5, 2020 is not fatal to her cause of action because the claim was timely filed under Tennessee law.

**b. Plaintiff has Plead Sufficient Facts to Maintain a § 1983 Claim for Interference with Her Parent-Child Relationship.**

The United States Supreme Court has long held that "rights involving private family life [are] worthy of special constitutional protection." *Moore v. City of Cleveland*, 431 U.S. 494, 499 (1977). "The Supreme Court has recognized some of the most important personal bonds necessary for individual freedom 'are those that attend the creation and sustenance of a family.'" *Walsh v. Erie Cnt'y Dept. of Job and Family Services*, 240 F.Supp.2d 731, 756 (N.D. Ohio 2003) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 619 (1984)). When the UCHS coaching staff failed to notify Amanda Michel of D.M.'s serious medical condition, and made the decision to subject him to further harm without seeking proper medical care for him, they denied Ms. Michel the opportunity to make those decisions on her minor son's behalf. Moreover, the deliberate indifference Defendants demonstrated for a mother's constitutional right to make medical

decisions for her son resulted in a loss of her companionship and society with her son who was rendered severely and permanently injured.

In order to state a claim under § 1983 a plaintiff must "(1) show the existence of a municipal policy or custom, and (2) that there is a causal link between the policy or custom and an alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). The thrust of Plaintiff's interference with her parental rights claim is that the Defendants failed to implement policies and procedures which were made mandatory by Tennessee law and by Defendants' association with the TSSAA. By virtue of Defendants' position as a school in the state of Tennessee which maintained an athletic program, Defendants were required to establish policies which trained coaches and administrative staff on the recognition and prevention of concussion related injuries. (Comp. ¶ 15-19, 47). By ignoring their legal and associational rules and responsibilities, Defendants engaged in a practice of and official policy of deliberate indifference to the health, safety and welfare of student athletes which is directly responsible for not only the injury suffered by D.M. but the infringement and impairment of Plaintiff's constitutional right to sustain and maintain familial bonds with her son.

Defendants wish to couch this issue as one of simple negligence on the part of Coach Marlow for failure to follow through on his duty to protect D.M. from a further risk of injury. This is partly true; however, this argument omits that Coach Marlow's failures are not his alone. But for the deliberate indifference to the well-known and heightened risk of harm presented by subjecting injured student athletes, like D.M., to further risk of harm by forcing them to continue to participate in contact sports, UCBE, UCHS and its administrative and coaching staff's policies and procedures directly impaired Plaintiff's constitutional rights. Had Defendants instituted the mandatory policies, Plaintiff would have maintained the secure bonds of her familial relationship.

Instead, the conscious, arbitrary and objectively reckless determination on the part of Defendants directly lead to her loss.

### 3. Defendants Violated Clearly Established Statutory and Constitutional Rights and Are Not Protected by Qualified Immunity.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When a government official's conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known" qualified immunity is not an available defense. *Summar v. Bennett*, 517 F.3d 1054, 1057 (6th Cir. 1998). "Thus, a defendant is entitled to qualified immunity . . . unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013).

In order to determine when a right is clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he was doing violated that right." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). In order to make this determination, the Sixth Circuit has stated that "we must first look to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Baker v. City of Hamilton*, 471 F.3d 601, 606 (6th Cir. 2006).

The individual Defendants in this case violated both D.M.'s right to be free from state-created danger and Plaintiff's right to be free of unwarranted interference with her familial relationship with her son. First, it is well-established that D.M. had a statutory and constitutional right to be free from the state-created danger to which he was exposed with deliberate indifference.

Specifically, D.M. as an "injured student-athlete participating in a contact sport has a constitutional right to be protected from further harm, and a state actor violates that right when the injured student-athlete is required to be exposed to a risk of harm by continuing to practice or compete." *Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165 (3rd Cir. 2017). Further, Tennessee has codified that right which requires:

> [T]hat a youth athlete who has been removed from play shall not return to the practice or competition during which the youth athlete suffered, or is suspected to have suffered, a concussion and not return to play or participate in any supervised team activity involving physical exertion, including games, competitions or practices, until the youth athlete is evaluated by a health care provider and receives written clearance from the health care provider for a full or graduated return to play.

Tenn. Code Ann. § 68-55-502 (January 1, 2014). Therefore, D.M.'s right to be free from exposure to further physical harm on the UCHS athletic field was firmly established and well-publicized by both state and federal law at the time he suffered a deprivation of that right on May 9, 2019.

Next, it is well-established that a person has a due process right to freedom of personal choice in family matters. *See Moore v. City of East Cleveland, Ohio*, 431 U.S. 494, 499 (1977). Specifically, Plaintiff had a constitutional right to direct the medical care of her child. *See Kanuszewski v. Mich. Dep't of Health and Human Services*, 927 F.3d 396, 411 (6th Cir. 2019). Furthermore, Tenn. Code Ann. § 68-55-502 requires that "[t]he governing authority of each public school . . . [a]dopt guidelines and other pertinent information and forms . . . to inform and [educate] . . . youth athletes and their parents or guardians of the nature, risk and symptoms of concussion and head injury, including continuing to play after concussion or head injury." Tenn. Code Ann. § 68-55-502(b)(1)(A). Here, Plaintiff was not educated or informed of the possible life-threatening injury posed to her son, or given an opportunity to exercise her parental right to direct D.M.'s medical care, a long-protected and well-established due process right under the Fourteenth

Amendment as well as mandated under Tennessee statutory law. Therefore, Defendants violated Plaintiff's protected liberty interest in maintaining her familial relationships and Plaintiff and her minor son suffered harm as a result.

The individual Defendants in this case are not entitled to the defense of qualified immunity because their affirmative actions directly lead to deprivations of well-established liberty interests of Plaintiff and her minor son, D.M.

### 4. Plaintiff Has Sufficiently Plead a Claim for Municipal Liability Against UCBE.

To state a claim for municipal liability in a § 1983 action, "a plaintiff must adequately allege (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance [of] or acquiescence to federal rights violations." *Spainhoward v. White Cnty., Tenn.*, 421 F.Supp.3d 524, 542 (M.D. Tenn. 2019) (quoting *Burgess v. Fisher*, 735 F.3d 462, 478 (6th Cir. 2013)).

In order to state a claim under the policy or custom prong, a plaintiff must show "that [an] unconstitutional policy or custom existed, that the policy was connected to the [municipality], and that the policy or custom caused [the] constitutional violation." *Napier v. Madison Cnty.*, 238 F.3d 739, 743 (6th Cir. 2001). As stated above, both Plaintiff and D.M. suffered deprivations of their federally protected rights. Plaintiff suffered an interference with her parent-child relationship with D.M. by being deprived of her right to direct his medical care. D.M.'s right to be free of state-created danger was infringed when he, as an injured student-athlete, was required to reenter the full-contact football practice without first receiving proper and appropriate medical treatment. Each of these violations was directly caused by UCBE and Defendant James E. Carter's official policy of ignoring and disregarding the mandates of Tennessee's General Assembly decreed in

Tenn. Code Ann. § 68-55-502. (Comp. ¶ 15-17, 20). This official policy of UCBE and Defendant James E. Carter, as the Director of the UCBE, directly caused constitutional violations endured by Plaintiff and her minor son.

While UCBE and Defendant James E. Carter's official policy of disregard to their legal duties causing Plaintiff and D.M.'s injuries is enough to hold them liable for the damages they caused, Plaintiff has further alleged facts showing inadequate training and supervision of UCBE's athletic coaches and staff. A municipality may be held liable for its federal rights abuses where "there is essentially a complete failure to train [. . .], or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Spainhoward*, 421 F.Supp.3d at 543 (citing *Hays v. Jefferson Cty, Ky.*, 668 F.2d 869, 874 (6th Cir. 1982).

Plaintiff has sufficiently plead facts which demonstrate that UCBE failed so utterly in their legal obligation to train and supervise their athletic staff that the deprivations endured by Plaintiff and D.M. were unavoidable. For instance, UCBE completely failed to train regarding recognition of symptoms of concussions; how to seek proper medical treatment for suspected concussions; or determining when a youth athlete may safely return to play or practice. (Comp. ¶ 20). The need for such training is so pervasive that both the Tennessee General Assembly and the TSSAA have mandated that this training occur. (Comp. ¶ 15-19). In fact, the press release accompanying the passage of Tenn. Code Ann. § 68-55-502 stated, "[t]his is a much needed bill . . . Education and instruction regarding concussions can help avoid a preventable tragedy." *Tennessee News Release, S. Rep. 2/20/2013*. Furthermore, the CDC has called the prevalence of student-athlete concussions in recent years, a problem of "epidemic proportions." Id.

Had UCBE and Defendant James E. Carter maintained an official policy of compliance with Tenn. Code Ann. § 68-55-502 and the TSSAA protocol instead of an official policy of inaction and/or simply trained and supervised their athletic staff in the proper recognition, treatment, and recovery protocols for concussed youth athletes, Plaintiff and D.M. would not have been injured and Coach Marlow would not have instructed or allowed D.M. to return to the full-contact football practice.

## B. PLAINTIFF HAS PROPERLY PLEAD NEGLIGENCE AGAINST THE INDIVIDUAL DEFENDANTS IN THE ALTERNATIVE TO THE TGTLA.

The Tennessee Government Tort Liability Act (hereinafter "TGTLA") "removes the immunity of governmental entities for injuries proximately caused by a negligent act or omission of an employee acting within the course and scope of his or her employment unless the injury arises out of specially delineated exceptions" *Morrow v. Metro. Gov't of Nashville*, 2020 WL 5106763, at *4 (M.D. Tenn. August 21, 2020). Where immunity is retained by the governmental entity, the TGTLA allows for governmental employees to be sued in their individual capacity. *See, Colson v. City of Alcoa, Tennessee*, 2017 WL 4019596, at *11 (E.D. Tenn. Sept. 11, 2017) ("In other words, the TGTLA does not provide governmental entities and employees with simultaneous immunity."). The TGTLA is "in derogation of the common law and must be strictly construed." *Lockhart v. Jackson-Madison Cnty. Gen. Hosp.*, 793 S.W.2d 943, 945 (Tenn. Ct. App. 1990).

Because the TGTLA must be interpreted strictly, Plaintiff has brought her negligence claim against the individual Defendants in the alternative due to its command that it is only available when the individual Defendants are employees acting in their official capacity. Moreover, Tenn. Code Ann. § 29-20-313(a) states:

> (a) When one (1) or more defendants to a lawsuit claim to be employees of a governmental entity as defined by § 29-20-107 and are therefore entitled to the governmental immunity granted by this

> chapter, it shall be a question of fact whether the defendant or defendants claiming immunity are such employees. If the trier of fact determines that the defendant claiming immunity is not a governmental entity employee, the lawsuit as to that defendant shall proceed like any other civil case. If the trier of fact determines that the defendant claiming immunity is a governmental entity employee, the lawsuit as to that defendant shall proceed in accordance with this chapter.

Therefore, Plaintiff acknowledges the strict reading of the above statute to state that the issue of employment and whether the actions complained of were in the course and scope of that employment are questions of fact leaving open the necessity to bring individual negligence claims against the employee Defendants. Both Tenn. R. Civ. P. 8.01 and Fed. R. Civ. P. 8(a)(3) provide for pleading "in the alternative or different types of relief."

Should the trier of fact conclude than any number or all of the individual Defendants were acting outside of the scope of their employment in relation to the facts underlying the TGTLA claims, Plaintiff has still sufficiently plead allegations of negligence individually. As Defendants correctly note, in a negligence claim a plaintiff must prove: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal cause." *Dillingham v. Millsaps*, 809 F.Supp.2d 820, 854 (E.D. Tenn. 2011) (quoting *Estate of French v. Stafford House*, 333 S.W.3d 546, 554 (Tenn. 2011)).

Defendants argue that should any of the individual Defendants be found not to be acting in within the course and scope of their individual capacity, they did not owe any duty of care to Plaintiff or D.M. whatsoever. Def. Brief p. 21. "The determination of whether a duty exists is a question of law." *Draper v. Westerfield*, 181 S.W.3d 283, 291 (Tenn. 2005). "In general, all persons have a duty to exercise reasonable care to avoid causing foreseeable injury to others." *Doe v. Linder Constr. Co.*, 845 S.W.2d 173, 178 (Tenn. 1992). It is the law, however, that "one does

not have duty to act for the protection of a third party unless he or she 'stands in some special relationship to the person who is the source of the danger, or to the person who is foreseeably at risk from the danger.'" *Draper*, 181 S.W.2d at 291 (quoting *Turner v. Jordan*, 957 S.W.2d 815, 818 (Tenn. 1997). Further, "[o]ne who assumes to act, even though gratuitously, may thereby become subject to the duty to act carefully." *Id.*

Therefore, should it be determined that any or all of the individual Defendants were not employees or acting outside the scope of their employment with UCBE, they had assumed a duty to act reasonably. For example, if Defendants Marlow and Kerr were not acting within the course and scope of their employment, they had still assumed the duties to act as high school football coaches and the attendant responsibilities of those positions. The same could be said for each and every one of the individual Defendants. Therefore, the allegations of negligence plead in the alternative against the individual Defendants are valid.

### C. PLAINTIFF'S TGTLA CLAIMS ARE PROPERLY BEFORE THIS COURT.

According to 28 U.S.C. § 1367, the law provides that "district courts shall have supplemental jurisdiction over all other claims that are so related claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Such is the case with Plaintiff's TGTLA and general negligence claims raised against Defendants. However, should the Court dismiss Plaintiff's federal claims, her TGTLA claim should be litigated in state court.

### CONCLUSION

For the reasons set forth herein, Defendants Union County Board of Education, James E. Carter, Shane Brown, Larry Kerr, and Derek Marlow's Motion to Dismiss should be denied.

Should the Court determine any of Plaintiff's claims are not well-plead, she requests permission to Amend her Complaint pursuant to Fed. R. Civ. P. 15(a)(2).

Respectfully submitted this 21st day of September, 2020.

/s/ Jeffrey H. Glaspie_____
Marcos M. Garza, BPR#021483
Timothy L. Baldridge, BPR#015777
Jeffrey H. Glaspie, BPR#033311
*Attorneys for Plaintiff*
**GARZA LAW FIRM, PLLC**
550 W. Main Street, Suite 340
Knoxville, Tennessee 37902
(865) 540-8300 Telephone
(865) 474-9397 Facsimile

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Brief in Opposition to Defendants Motion to Dismiss was filed with the Court using the CM/ECF system this 21st day of September, 2020, which will provide copies to all parties of record.

/s/ Jeffrey H. Glaspie _____